# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

_____ )
                                     )
**AGILITY DEFENSE & GOVERNMENT**     )
**SERVICES, INC., f/k/a TAOS**       )
**INDUSTRIES, INC.,** a Delaware     )
corporation with its principal of business )
located in Madison, Alabama          )
                                     )
**AGILITY INTERNATIONAL, INC.,** a   )
Delaware corporation with its principal )
place of business located in Alexandria, )
Virginia                             )
                                     )
        PLAINTIFFS,              )
                                     )
  v.                              )     CASE NO. _____
                                     )
**U.S. DEPARTMENT OF DEFENSE**       )
                                     )
**LEON E. PANETTA,** in his official )
capacity as Secretary of the U.S.    )
Department of Defense                )
                                     )
**DEFENSE LOGISTICS AGENCY**         )
                                     )
**VICE ADM. ALAN THOMPSON,** in      )
his official capacity as Director of the )
Defense Logistics Agency             )
                                     )
        DEFENDANTS.              )
_____)

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Agility Defense & Government Services, Inc. f/k/a Taos Industries, Inc. ("DGS") and Agility International, Inc. ("Agility International") bring this Complaint for Declaratory and Injunctive Relief against the United States Department of Defense ("DoD"); Leon E. Panetta, Secretary of Defense; the Defense Logistics Agency ("DLA"); and Vice Admiral Allan M. Thompson, Director of DLA. In support thereof, Plaintiffs state as follows:

## NATURE OF THE ACTION

1. DGS and its subsidiary Agility International bring this lawsuit in response to DLA's arbitrary, capricious, and unlawful refusal to lift their suspension from federal government contracting. DLA suspended DGS and its subsidiaries in November 2009 in connection with the indictment of DGS' ultimate corporate parent The Public Warehousing Company K.S.C. ("PWC"), even while admitting "there are no allegations that [DGS and its subsidiaries] engaged in wrongdoing." Since then, DLA has adopted shifting, inconsistent, and unsubstantiated rationales to rebuff all attempts by DGS and Agility International to have the suspension lifted as to them.

2. The law does not allow DLA to hold DGS and its subsidiaries hostage in this manner. This lawsuit seeks immediate relief under the Administrative Procedures Act, 5 U.S.C. § 702, *et seq.*, to end the suspension of DGS and its subsidiaries (including Agility International) as arbitrary and capricious, an abuse of discretion, otherwise contrary to law, and a violation of due process.

3. Specifically, DGS and Agility International seek declaratory and injunctive relief from this Court to, *inter alia*, (1) declare the suspension of DGS and its subsidiaries void; (2) declare the continuing suspension of DGS and its subsidiaries arbitrary and capricious, an abuse of discretion, otherwise contrary to law, and a violation of due process; (3) declare DGS and its subsidiaries eligible for the award of federal government contracts; and (4) enter an order compelling DLA to remove DGS and its subsidiaries from the Excluded Parties List.

## PARTIES TO THE ACTION

4. Plaintiff Agility Defense & Government Services, Inc. ("DGS") is a Delaware corporation with its principal place of business in Madison, Alabama. DGS and its subsidiaries provide logistics support, operational services, and defense items to governmental agencies. DGS' ultimate parent company is The Public Warehousing Company, K.S.C. ("PWC").

5. Plaintiff Agility International, Inc. ("Agility International") is a Delaware corporation with its principal place of business in Alexandria, Virginia. Agility International is a provider of project cargo logistics and international household goods relocation services. It is a subsidiary of DGS. A chart showing where DGS and Agility International fit in the corporate structure of PWC is attached as Exhibit 1.

6. Defendant United States Department of Defense ("DoD") is an executive department of the United States.

7. Defendant Leon E. Panetta is the Secretary of the United States Department of Defense, sued here in his official capacity.

8. Defendant Defense Logistics Agency ("DLA") is a "combat support agency" under the Department of Defense. 10 U.S.C. § 193(f).

9. Defendant Vice Adm. Alan Thompson is the Director of the Defense Logistics Agency, sued here in his official capacity.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This action raises federal questions under the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 702.

11. The relief requested is authorized by 5 U.S.C. § 702 (Administrative Procedure Act); 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. § 2201 (Declaratory Judgment Act); 28 U.S.C. § 2202 (further relief), and the United States Constitution.

12. Venue lies in this district under 28 U.S.C. § 1391(e).

## BACKGROUND

### I. Agility Defense & Government Services, Inc.'s Business As A Defense Contractor

13. DGS, formerly Taos Industries, Inc. ("Taos"), was formed as a family-owned corporation in 1989 with its principal place of business in Madison, Alabama. Since its inception, DGS has been actively engaged in providing services and supplies to DoD.

14. After the death of the managing family member shareholders in 2005 in a tragic accident, the surviving shareholders and heirs of the deceased sold the entirety of their interests in Taos to PWC Logistics Services, Inc., a Delaware corporation headquartered in Alexandria, Virginia, which was a wholly-owned holding company subsidiary of PWC Logistics Services Company K.S.C.C., a Kuwait shareholding company, which, in turn, was a wholly-owned subsidiary of The Public Warehousing Company K.S.C., a Kuwait shareholding company ("PWC").

15. Subsequent to the purchase of Taos by PWC Logistics Services, Inc., Taos changed its name to Agility Defense & Government Services, Inc.; PWC Logistics Services, Inc. changed its name to Agility DGS Holdings, Inc.; and PWC Logistics Services Co. K.S.C.C. changed its name to Agility DGS Logistics Services Co. K.S.C.C. The relationships of the corporate entities are shown in Exhibit 1.

16. DGS' leadership includes several retired senior United States military officers. Since 2008, retired Army Lt. Gen. Joseph M. Cosumano, Jr. has been the President and Chief Executive Officer of DGS. He served in the Army from 1970 to 2004, retiring from active duty

as the commander of the U.S. Space and Missile Defense Command in Huntsville, Alabama. Numerous other retired general officers have served on DGS' Board of Directors.

17.     In recent years, DGS has performed services for the United States military on several large DoD contracts:

(a)     DGS was a key subcontractor responsible for logistics services on the Army's Logistics Civil Augmentation Program IV ("LOGCAP IV") contract, providing logistics services in support of military contingency operations in Afghanistan and Kuwait.

(b)     DGS held a prime contract with DLA to operate several Defense Reutilization Marketing Offices ("DRMOs") in the Middle East handling surplus military property.

(c)     Through joint ventures, DGS performed a contract with the U.S. Air Force to provide base operating services at Moron Air Base in Spain and seven contracts with the Defense Energy Support Center to provide bulk fuel storage at seven Air Force installations across the world.

18.     DGS was cleared to perform work on classified contracts for the United States military.  To obtain a facility clearance enabling it to perform classified contracts, DGS was required to enter into a Special Security Agreement ("SSA") with the DoD Defense Security Service.

19.     The SSA established a management and operational structure which shielded DGS' day-to-day operations from any foreign influence via its parent companies, including PWC, who were limited to non-controlling participation on DGS' Board of Directors.  So long as DGS was performing any classified contracts requiring a facility clearance, DGS abided by the SSA.

20. Prior to the suspension by DLA, DGS' business had grown to an annual contract revenue of $450 million and approximately 1231 employees.

## II. The Defense Logistics Agency's Suspension of Agility Defense & Government Services, Inc. And Its Subsidiaries From Federal Government Contracting

21. On November 9, 2009, a grand jury issued an indictment of PWC in the U.S. District Court for the Northern District of Georgia for violations of 18 U.S.C. §§ 371, 1041, and 1343. This indictment related to the alleged conduct of PWC regarding the performance of a series of government prime vendor contracts in Kuwait and Iraq beginning in June 2003, some two years prior to the acquisition of DGS by PWC's subsidiary Agility DGS Holdings, Inc.

22. Neither DGS nor its subsidiaries performed any work on the prime vendor contracts that are the subject of the indictment and, by virtue of the SSA, were isolated from PWC control.

23. Notwithstanding its status as a separate corporate entity, the absence of any direct ownership by PWC, the existence of an approved SSA, and the complete lack of involvement in any of the alleged wrongful activities of PWC, DLA summarily placed DGS on the Excluded Parties List, thereby suspending DGS from any further federal government contract awards.

24. The Federal Acquisition Regulation ("FAR") describes suspension as a "serious action to be imposed on the basis of adequate evidence" when "immediate action is necessary to protect the Government's interest." FAR 9.407-1(b)(1). Suspension is a "temporary" measure designed to protect the government "pending the completion of an investigation and such legal proceedings as may ensue." FAR 9.407-3(c)(2); FAR 9.407-4(a).

25. DLA also suspended 128 other entities it deemed to be "affiliates" of PWC. Most of those 128 suspended entities did purely commercial contracting and to that extent, suspension was unnecessary to protect the government's interest.[1]

26. DGS' suspension was effective as of November 16, 2009. Various DGS subsidiaries were suspended over the following days, including Agility International on November 23, 2009.

### III. The Defense Logistics Agency's Shifting, Inconsistent, and Unsubstantiated Theories for Maintaining the Suspensions of DGS and its Subsidiaries

27. On November 17, 2009, DGS sought to rescind its suspension through the prescribed administrative procedures before the DLA Suspension and Debarment Official.

28. Upon consideration of the record, the DLA Suspension and Debarment Official affirmed the suspension of DGS and its subsidiaries, including Agility International, in a Memorandum of Decision dated December 10, 2009, attached as Exhibit 2. DLA stated that "while there are no allegations that [DGS and its subsidiaries] engaged in wrongdoing, the FAR recognizes that suspensions may be extended to affiliates regardless of culpability." (Exhibit 2: 12/10/09 DLA Memorandum of Decision at 4.) DLA further stated that "[t]he suspensions are temporary pending the completion of criminal proceedings against PWC." (*Id*. at 10.)

29. In its December 2009 Memorandum of Decision, DLA represented that:

(a) The basis for suspending DGS and its subsidiaries (including Agility International) was that they are "affiliates" of PWC, as defined by FAR 9.403.

(b) "Because the[ir] suspensions are based on their affiliation to PWC, the issue is *not* whether the affiliates' conduct renders them not presently responsible" to receive

---

[1] At the time of the suspension, PWC and its subsidiaries employed approximately 37,000 people operating from 550 offices in 120 countries.

7

government contracts.  (Exhibit 2: 12/10/09 DLA Memorandum of Decision at 5 (emphasis added).)

       (c)    Rather, "the issue is whether PWC has the ability to directly or indirectly control these affiliates."  (*Id*.)  This is because FAR 9.403 provides that "[b]usiness concerns, organizations, or individuals are affiliates of each other if, directly or indirectly, . . . one controls or has the power to control the other."

30.    After exhausting administrative remedies, DGS, Agility International, and other PWC subsidiaries engaged in federal government contracting filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction in the U.S. District Court for the District of Columbia, arguing, among other things, that mere affiliation was not enough in light of, *inter alia*, the SSA.

31.    That court denied the motion.  It reasoned there was no irreparable harm to DGS and Agility International because "[t]he plaintiffs have not shown that restructuring so as to extinguish their relationships with PWC to DLA's satisfaction cannot result in the plaintiffs being removed from the suspension list."

32.    Similarly, in February 2011, DLA denied a request to lift DGS' suspension and repeated its position that because PWC "is the parent company of and controls DGS, Inc., either directly or indirectly," DGS' suspension "is based upon its affiliation, as defined by FAR 9.403, to PWC."  (Exhibit 3: 2/4/11 DLA Letter at 1.)

33.    If DGS and its subsidiaries restructured their relationship with PWC, such that it would not maintain control, it follows that the suspension of DGS and its subsidiaries must be lifted because they would not be "affiliates."

34. DGS and its subsidiaries presented just such a proposal to DLA. However, DLA rejected it and refused to lift the suspension.

35. Specifically, in July 2011, DLA was presented with a proposal whereby DGS would divest a 60% controlling interest in Agility International and retain only a non-voting minority interest so long as DGS remains ineligible for government contracting. (*See* Exhibit 4: 7/6/11 Letter to DLA with Attached Term Sheet.)

36. Under that proposal, DGS—and thus PWC, whose control was the sole basis for suspension—would lose the ability to control Agility International either directly or indirectly, such that Agility International would no longer be an "affiliate" of PWC as defined by FAR 9.403.

37. In maintaining the suspension of DGS and its subsidiaries, DLA has abandoned its stated justification of affiliation, instead applying a different standard for DGS than it has previously applied to other contractors. This is an obvious effort to exercise settlement leverage in the case against PWC, even though that case has nothing to do with DGS.

38. DLA's unlawful and arbitrary refusal to lift the suspension of DGS and its subsidiaries is inconsistent with DLA's past practice.

39. In March 2010, DLA accepted just such a control-stripping solution in deciding not to suspend Contingency Response Services, LLC ("CRS"), in which DGS owned (and still owns) a 20% stake. Specifically, DLA accepted CRS' proposal to convert DGS' minority ownership stake into a non-voting interest unable to exercise control over CRS so long as DGS remained ineligible for government contracting.

40. But DLA now has applied a different standard than was applied to CRS. DLA responded to the Agility International proposal that "it is not in the best interest of the

9

government to do business with any PWC . . . affiliate or subsidiary, regardless of the equity interest, until the criminal case has been concluded." (Exhibit 5: 7/14/11 DLA Letter at 2.) In so doing, DLA ignored the provisions of the FAR and the even-handed treatment it requires.

41. Moreover, having originally stated in December 2009 that the suspension turned entirely on PWC's ability to control the affiliate and *not* on whether the affiliate is presently responsible to receive government contracts, DLA changed its rationale yet again in July 2011, stating that the information before it was "insufficient to reestablish your present responsibility"—something that has never been at issue. (*Id.*)

42. DLA had no occasion to assess DGS' or Agility International's present responsibility, which, under FAR 9.1 is determined prior to awarding of new business.

43. DGS and its subsidiaries are presently responsible to receive government contracts.

## IV. The Unlawful Nature of the Defense Logistics Agency's Continuing Refusal to Lift the Suspension

44. Because of DLA's intransigence, DGS and its subsidiaries have remained suspended from federal government contracting since November 2009 without ever being implicated in any wrongdoing.

45. Indeed, the government has not initiated any criminal or civil proceedings against DGS or its subsidiaries. Although the FAR provides that "in no event may a suspension extend beyond 18 months unless legal proceedings have been initiated within that period," FAR 9.407-4(b), DLA has nonetheless unlawfully maintained the suspension of DGS and its subsidiaries.

46. When DGS objected to the excessive length of its suspension in a November 24, 2010 letter to DLA, attached as Exhibit 6, DLA's February 2011 response (Exhibit 3) failed even to acknowledge the pertinent requirements of the FAR, let alone explain the propriety of

continuing the suspension. Thus, in addition to being arbitrary and capricious, the continued suspension is also unlawful.

47. DGS and its subsidiaries face an indefinite suspension—already running nearly two years—pending the outcome of the case against PWC, in which they have no involvement and are not alleged to have done anything wrong. This indefinite suspension of blameless contractors is a violation of due process as well as the express provisions of the FAR.

48. DLA has acknowledged "the significant and adverse impact of these suspensions on [DGS and its subsidiaries]" and "the severity of the consequences of the suspensions." (Exhibit 2: 12/10/09 DLA Memorandum of Decision at 7.)

49. Because of their suspension from government contracting, DGS and its subsidiaries have been precluded from bidding on government contracts that they otherwise would have sought.

50. After over two years on the Excluded Parties List, in which DGS has been ineligible to receive new work from the federal government despite still never having been accused of any wrongdoing, DGS' business has collapsed, from $450 million in annual contract revenue and over 1200 employees, to only $79 million and less than 50 employees.

## **COUNT ONE**
(Administrative Procedures Act - Inadequate Rationale for Suspension)

51. Paragraphs 1-49 above are incorporated by reference as if fully set forth herein.

52. DLA's only asserted basis for suspending DGS and its subsidiaries was their affiliation with PWC as wholly- or majority-owned subsidiaries that, notwithstanding the government-approved SSA, PWC was able to control.

53.     FAR 9.403 provides that "[b]usiness concerns, organizations, or individuals are affiliates of each other if, directly or indirectly, . . . one controls or has the power to control the other."

54.     DLA rejected a proposal to lift Agility International's suspension by adjusting its ownership structure to strip control from PWC, rendering Agility International no longer an "affiliate" of PWC as defined by FAR 9.403.

55.     DLA rejected that proposal despite previously approving a materially identical solution for a similarly situated contractor, CRS.

56.     In rejecting the proposal, DLA represented that it would continue the suspension of "any PWC . . . subsidiary, *regardless of PWC's equity interest*."

57.     However, DLA has identified no basis for suspending a subsidiary that is not controlled by PWC and, thus, is not an "affiliate."

58.     DLA's subsequent assertion that the information before it was "insufficient to reestablish [DGS' and Agility International's] present responsibility" is an unsubstantiated post-hoc rationalization with no support.

59.     Rather, DLA had previously represented that "the issue is not whether the affiliates' conduct renders them not presently responsible."

60.     DLA had no cause for addressing DGS' or Agility International's present responsibility.

61.     DLA's shifting, inconsistent, and unsubstantiated rationales for suspension render its continued suspension of DGS and Agility International arbitrary and capricious, an abuse of discretion, and contrary to law.

## COUNT TWO
(Administrative Procedures Act - Punitive Suspension)

62. Paragraphs 1-49 above are incorporated by reference as if fully set forth herein.

63. FAR 9.402(b) requires that suspension "be imposed . . . not for purposes of punishment."

64. DLA has applied the FAR punitively against DGS and its subsidiaries as a means to exert leverage in litigation against the ultimate corporate parent PWC, imposing a form of economic sanctions to deprive PWC subsidiaries of a chief source of business.

65. DLA's actions are contrary to law and an abuse of discretion.

## COUNT THREE
(Administrative Procedures Act - Excessive Suspension)

66. Paragraphs 1-49 above are incorporated by reference as if fully set forth herein.

67. DLA's continued suspension of DGS and Agility International, long after the time permitted by the FAR, is contrary to law.

68. Suspension is only a "temporary" measure designed to protect the government "pending the completion of an investigation and such legal proceedings as may ensue." FAR 9.407-3(c)(2); FAR 9.407-4(a).

69. FAR 9.407-4(b) further provides that "[i]f legal proceedings are not initiated within 12 months after the date of the suspension notice, the suspension shall be terminated unless an Assistant Attorney General requests its extension, in which case it may be extended for an additional 6 months."

70. Upon information and belief, no request under FAR 9.407-4(b) for a 6-month extension of the suspension of DGS and its subsidiaries was made by an Assistant Attorney General.

71. FAR 9.407-4(b) further provides that "in no event may a suspension extend beyond 18 months unless legal proceedings have been initiated within that period."

72. The government has not initiated any legal proceedings against DGS or its subsidiaries.

73. DGS and its subsidiaries have been suspended since November 2009, well over 18 months.

74. The excessive and continuing suspension of DGS and its subsidiaries is contrary to law and an abuse of discretion.

## COUNT FOUR
(Violation of Constitutional Due Process)

75. Paragraphs 1-49 and 67-74 above are incorporated by reference as if fully set forth herein.

76. The Fifth Amendment applies to DLA's actions and guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

77. As a means to exert leverage in litigation against the ultimate corporate parent PWC, DLA has indefinitely suspended DGS and its subsidiaries from federal government contracting even though they are blameless, have no involvement in that litigation, and have not had other legal proceedings initiated against them by the government.

78. DLA's continued suspension of DGS and its subsidiaries under these circumstances violates the Fifth Amendment's guarantee of due process.

## PRAYER FOR RELIEF

WHEREFORE, DGS and Agility International pray that this Court:

A. Provide for expeditious proceedings in this action in light of the severe continuing economic detriment to DGS and its subsidiaries and the failure of the government to undertake timely appropriate administrative action;

B. Declare the suspension of DGS and its subsidiaries to be void;

C.  Declare the continuing suspension of DGS and its subsidiaries arbitrary and capricious, an abuse of discretion, otherwise contrary to law, and a violation of due process;

D.  Declare DGS and its subsidiaries to be eligible for the award of government contracts;

E.  Enter an order compelling DLA to remove DGS and its subsidiaries from the Excluded Parties List;

F.  Award DGS and Agility International their costs and reasonable attorney's fees incurred in this action; and

G.  Grant DGS and its subsidiaries such other and further relief as the Court deems just and proper.

/s/ Gary L. Rigney
Gary L. Rigney
Alabama Bar RIG-002
5017 Wainwright Avenue
Huntsville, Alabama 35802
Office: (256) 971-0721
Fax:    (256) 971-9785
E-mail: grigney@grigney.com