FILED
2012 Jun-26  AM 11:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **AGILITY DEFENSE AND GOVERNMENT SERVICES, INC.**, *et al.*, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-4111-NE** |
| | ) | |
| **UNITED STATES DEPARTMENT OF DEFENSE**, *et al.*, | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Agility Defense and Government Services, Inc., and Agility International, Inc., commenced this action against the United States Department of Defense, Secretary of Defense Leon E. Panetta, the Defense Logistics Agency, and the Director of the Defense Logistics Agency, Vice Admiral Mark D. Harnitchek, seeking declaratory and injunctive relief to lift plaintiffs' suspension from government contracting.[1]  Plaintiffs moved for summary judgment, and defendants filed a cross-motion for summary judgment.[2]  Upon consideration of the motions, briefs, and evidentiary submissions, the court has determined that summary judgment is due to

---

[1] Doc. no. 1 (Complaint).

[2] Doc. no. 6 (Plaintiffs' Motion for Summary Judgment); doc. no. 9 (Defendants' Motion for Summary Judgment).

be granted in favor of plaintiffs and against defendants.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[3]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman*

---

[3] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

When presented cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  10A Wright, Miller & Kane, *Federal Practice and Procedure:  Civil 3d* § 2720, at 335-36 (1998) (footnote omitted).  As another court within this Circuit has observed:

> "Cross motions for summary judgment do not change the standard." *Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 499 F.3d 32, 38 (1st Cir. 2007). "'Cross

> motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)). "Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts." *Id.*; *accord Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) ("When considering motions from both parties for summary judgment, the court applies the same standard of review and so may not resolve genuine issues of material fact. Instead, [the court must] consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard.") (citations omitted).

*Ernie Haire Ford, Inc. v. Universal Underwriters Insurance Co.*, 541 F. Supp. 2d 1295, 1297-98 (M.D. Fla. 2008). *See also American Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005) ("This court reviews the district court's disposition of cross-motions for summary judgment de novo, applying the same legal standards used by the district court, viewing the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolving all reasonable doubts about the facts in favor of the non-moving party.").

## II. BACKGROUND

The facts in this case are not in dispute. Plaintiffs, Agility Defense and Government Services, Inc., and Agility International, Inc., are companies that have historically derived a significant portion of their operating revenue from contracts with the United States government. The genesis of this action lies in plaintiffs'

corporate relationship to Public Warehousing Company, K.S.C. ("PWC"), a Kuwaiti corporation that specializes in logistics.  PWC owns scores of subsidiary entities.  Some of those companies are direct subsidiaries of PWC, and others are indirect subsidiaries, owned by the direct subsidiaries.  Plaintiff Agility Defense and Government Services, Inc. ("DGS") is a Delaware corporation with its principal place of business in Madison County, Alabama, and an indirect subsidiary of PWC.[4]  There are three layers of subsidiaries between PWC and DGS.[5]  Plaintiff Agility International, Inc. ("Agility") is a Delaware corporation with its principal place of business in Alexandria, Virginia, and a direct subsidiary of DGS; therefore, it also is an indirect subsidiary of PWC.[6]

The Defense Logistics Agency ("the Agency"), is a "combat support agency" of the Department of Defense.  10 U.S.C. § 193(f)(3).  As its name suggests, the Agency is tasked with providing logistical support to the military and naval forces of the United States.  Its Director is defendant Vice Admiral Mark D. Harnitchek.[7]

## A.     Suspension of Government Contractors

---

[4] *See* doc. no. 1-1 (Organizational Chart).

[5] *Id.*  PWC directly owns Agility DGS Logistics Service Company, another Kuwaiti entity.  That company, in turn, owns PWC Logistics Services Holding, a Dutch company.  The Dutch company owns Agility DGS Holdings, Inc., an entity incorporated in an unspecified U.S. state.  That holding company directly owns plaintiff DGS.  *Id.*

[6] *See id.*

[7] Doc. no. 5 (Answer) ¶ 8.

The regulations controlling government contracting are found in the Federal Acquisitions Regulation System, Title 48 of the Code of Federal Regulations. The regulations empower the "suspending official" of a government agency to prevent certain contractors from doing business with the government. If a determination that a contractor has engaged in certain prohibited activity is made, the suspending official can "debar" that contractor doing business with the government for a fixed period of time, lasting up to three years. *See* 48 C.F.R. §§ 9.406-1-5. The suspending official also has the power to suspend a company or individual from government contracting pending determination of whether debarment is appropriate. *See id.* §§ 9.407-1-5. A suspension can last up to eighteen months without any formal action being taken against the suspended contractor. *See id.* § 9.407-4(b). However, once proceedings are initiated, the suspension can remain in effect until a final determination is made. *Id.*

While suspended, a contractor is placed on the "Excluded Parties List." *See* 48 C.F.R. § 9.404. Those on the Excluded Parties List are ineligible for any new government contracts.[8] Although a suspension may be issued by a single government

---

[8] *See, e.g.*, doc. no. 11 (Certified Administrative Record) at Bates 485 (PWC Suspension Letter) (stating that contracts will not be solicited from or awarded to the suspended company).

The administrative record in this case contains scores of documents and hundreds of pages. The court will cite to the record by providing a name or description for the document cited, as well as the "Bates" numbers stamped at the top and bottom of each page, rather than the internal pagination used in each document.

agency, it prohibits all departments of the executive branch of the federal government from doing business with the suspended entity. *Id.* § 9.407-1(d). Existing contracts generally are unaffected by suspension, and continue uninterrupted.[9] The government may award new contracts to suspended contractors if "compelling reasons justify[] continued business dealings," *Id.*: *e.g.*, the contractor is the lone supplier of a vital commodity.

## B.    Suspension of Plaintiffs

In November of 2009, a grand jury in the Northern District of Georgia issued an indictment alleging that PWC defrauded the federal government of over $6 Billion dollars in relation to contracts to supply food to American military personnel stationed in the Middle East.[10] As a result of that indictment, M. Susan Chadick, the suspending official at the Agency, suspended the government contracting privileges of PWC on November 16, 2009.[11] Concurrent with that suspension, Chadick also suspended three PWC subsidiaries, including plaintiff DGS.[12] During the following weeks, numerous other PWC subsidiaries were suspended, including plaintiff Agility on November 23,

---

[9] *Cf.* PWC Suspension Letter, at Bates 485 (stating that "existing contracts will not be renewed").

[10] *See* Certified Administrative Record, at Bates 403-62 (Indictment).

[11] PWC Suspension Letter.

[12] Certified Administrative Record, at Bates 481 (DGS Suspension Letter). At the time of suspension, plaintiff DGS was known as "Taos Industries, Inc." *See, e.g.*, doc. no. 1 ¶ 13.

2009.[13]  The subsidiaries, including plaintiffs, were not accused of any involvement in the wrongdoing for which PWC was indicted; rather the sole basis for their suspension was their status as affiliates of PWC.[14]

### 1.      Plaintiffs' response to suspension

As permitted by the regulations, plaintiffs submitted written responses in opposition to their suspensions.[15]  In those submissions, plaintiffs argued that the suspensions were improper because they were not implicated in the indictment, which accused only PWC of wrongdoing.[16]  Moreover, they noted the extensive company policies in place to prevent fraud and other improprieties in government contracting.[17]

Plaintiffs also argued that suspension was particularly inappropriate as to DGS, because of a "Special Security Agreement" ("SSA") regarding certain DGS contracts.[18]  An SSA is necessary whenever a contractor working with classified or other sensitive information has foreign ownership.[19]  The SSA prohibits PWC from

---

[13] Certified Administrative Record, at Bates 735 (Agility Suspension Letter).

[14] *See, e.g.*, *id.* (stating that plaintiff Agility was "suspended based on its affiliation to PWC, a criminally indicted company").

[15] Certified Administrative Record, at Bates 592-622 (Joint Response to Notices of Suspension); *id.* at Bates 783-99 (Supplemental Response of Plaintiff DGS).

[16] Joint Response to Notices of Suspensions, at Bates 595.

[17] *Id.* at Bates 606-17.

[18] *See generally* Supplemental Response of Plaintiff DGS.

[19] *See id.* at Bates 788 ("[A]n SSA is a standard mitigation measure required by the [Defense Security Service] when it determines that such an agreement is necessary to enable the Federal Government to protect against the unauthorized disclosure of information related to national security.") (bracketed alterations supplied).

exercising control over DGS, limiting its participation to deliberations and decisions of the DGS board of directors, and allowing PWC to control only a minority of those directors.[20]  DGS applies the terms of its SSA to all government contracts, including those that do not involve sensitive information.[21]  Thus, plaintiffs argued, the SSA prevented PWC from controlling the contracting activities of DGS.

The Agency rejected plaintiffs' arguments in response to their suspensions on December 10, 2009.[22]  It noted that the compliance policies trumpeted by plaintiffs were identical to the policy that PWC had in effect, yet that company allegedly engaged in extensive fraud.[23]  Additionally, the Agency stated that the terms of the SSA made it clear that PWC had day-to-day interaction with DGS, undermining any argument that the SSA guaranteed the independence of DGS from PWC.[24]  The Agency found that "protection of the Government's interests requires the continued exclusion [of plaintiffs] from contracting with the U.S. Government."[25]

## 2.    Litigation in Washington, D.C.

---

[20] *Id.* at Bates 788-89.

[21] *Id.* at Bates 789 ("In view of this broad language in the SSA, the exclusions of PWC's involvement extend beyond classified controls to encompass the operation of [DGS's] business affairs in general.") (bracketed alteration supplied).

[22] Certified Administrative Record, at Bates 1269-78 (Memorandum of Decision on the Request for Termination of Suspensions).

[23] *Id.* at Bates 1273.

[24] *Id.* at Bates 1275.

[25] *Id.* at Bates 1278 (bracketed alteration supplied).

Concurrently with the submission of their responses to the Agency, plaintiffs filed suit in the United States District Court for the District of Columbia, seeking injunctive relief to prevent the suspension from taking effect.  Judge Richard W. Roberts held a November 23, 2009 hearing on plaintiffs' motion for a temporary restraining order, and denied that motion by oral order on December 11, 2009.[26]  The suspension went into effect, and plaintiffs remain suspended from government contracting.[27]  To date, their suspension has been in effect for thirty-one months.

### 3.    Plaintiffs' attempts to have their suspensions terminated

In November of 2010, DGS retained the services of Contractor Integrity Solutions, L.L.C., to act as in independent consultant, beginning in 2011.[28]  The purpose of the consulting agreement was to bolster the compliance system DGS already had in place.[29]  On the basis of the consulting agreement, DGS wrote to the Agency, and made an oral presentation, asking for the Agency to reconsider its suspension.[30]  The Agency denied that request, on the basis that it did not reflect "material information about a change in the relationship between DGS, Inc. and

---

[26] Certified Administrative Record, at Bates 623-728 (TRO Hearing Transcript); Certified Administrative Record, at Bates 1372-87 (Bench Ruling Transcript).

[27] Doc. no. 6-1 (Affidavit of Richard Brooks).

[28] Certified Administrative Record, at Bates 1706-08 (Engagement Letters).

[29] Id.

[30] Cf. Certified Administrative Record, at Bates 1710 (Letter Responding to Request for Reconsideration).

PWC."[31]

In June of 2011, after the suspension had been in effect for more than eighteen months, plaintiffs presented the Defense Logistics Agency the terms of a proposed "management buyout" of Agility.[32]  Under the terms of that proposal, management employees of Agility would form a new holding company.[33]  Those personnel would also resign their positions with PWC.[34]  The new company would then buy a 60% stake of Agility from DGS.[35]  PWC would ultimately retain a 40% stake in Agility through its indirect ownership of DGS, but the majority stake in the company would be held by the new company, whose employees would no longer be subject to PWC control.  Moreover, PWC would not have any voting or management authority over Agility while PWC remained suspended.[36]  Although the management buyout would have eliminated the formal control PWC previously held over Agility, the Agency informed plaintiffs that effecting the buyout would not terminate the suspension of Agility.[37]  Accordingly, plaintiffs did not conduct the management buyout.

---

[31] *Id.*

[32] Complaint, at Ex. 4 (Management Buyout Term Sheet).

[33] *Id.* at 1.

[34] Certified Administrative Record, at Bates 1739 (Presentation of Management Buyout Terms to the Agency).

[35] Management Buyout Term Sheet, at 1.

[36] *Id.* at 2.

[37] Certified Administrative Record, at Bates 1755-56 (Letter in Response to Management Buyout Proposal).  Chadick informed plaintiffs that "it is not in the best interests of the Government to do business with any PWC . . . affiliate or subsidiary, regardless of the equity interest, until the

Although the Agency rejected plaintiffs' proposed management buyout, it lifted the suspensions of other PWC subsidiaries in response to similar arrangements. At least two other companies had their suspensions terminated because they ceased to be affiliated with PWC. A company called LA3P was removed from the Excluded Parties List on December 17, 2009, "[b]ased on removing all management and operational control over LA3P from" DGS.[38] Another company, AFH Fuel Services, L.L.C., had its suspension lifted on September 15, 2010.[39] The suspension was terminated due to a change in the operating agreement governing the company.[40] Under the initial operating agreement, DGS had a minority ownership stake of 44%, and the authority to appoint one of the three "Managers" of the company.[41] Under the amended operating agreement, DGS maintained its ownership stake, but not its ability to appoint a Manager.[42]

Plaintiffs brought this action for injunctive and declaratory relief, seeking to

---

criminal case has been concluded." *Id.* at Bates 1756.

[38] Certified Administrative Record, at Bates 1395 (Termination of Suspension Letter, LA3P). The record does not indicate how that change was brought about.

[39] Certified Administrative Record, at Bates 1670 (Termination of Suspension Letter, AFH Fuel Services, L.L.C.).

[40] *Id.*

[41] *Cf.* Certified Administrative Record, at Bates 1656 (Letter of Counsel). The record does not actually contain the operating agreement under which DGS had that authority. However, the letter of counsel, and the amended operating agreements, demonstrate what the prior arrangement must have been.

[42] Certified Administrative Record, at Bates 1662-69 (Amended Operating Agreement).

have the suspension lifted.  At present, the prosecution of PWC is ongoing, but no allegations of any wrongdoing have ever been leveled againts either plaintiff.

## III.  DISCUSSION

Plaintiffs present four counts in their complaint.  The first three counts are based upon the Administrative Procedure Act.  In the first count, plaintiffs allege that the Defense Logistics Agency has provided an inadequate rationale for the suspensions.  In the second count, plaintiffs allege that the suspensions are punitive. And in the third, they argue that the suspensions are excessive in duration.  In the fourth count, plaintiffs allege that the continuing suspensions violate the Due Process Clause of the Fifth Amendment to the United States Constitution.

**A.     The Administrative Procedure Act**

The Administrative Procedure Act ("APA") provides that, when reviewing the action of an administrative agency, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A). Under that standard, a court's review of an agency decision is deferential, even at the summary judgment stage.  *Kirkpatrick v. White*, 351 F. Supp. 2d 1261, 1270 (N.D. Ala. 2004) (citing *Preserve Endangered Area's of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996)).  "To prove an agency's

13

decision was arbitrary and capricious, the challenging party must show the record is devoid of reasonable evidence supporting the agency's decision." *Id.* (citing *Organized Fishermen of Florida v. Franklin*, 846 F. Supp. 1569, 1573 (S.D. Fla. 1994)).

**B.    Justiciability of Plaintiffs' Claims**

Defendants argue that the decision of the Agency to suspend plaintiffs, and to continue to hold them suspended, is not justiciable because those decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  An agency decision is considered to fall within that exception to judicial review "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Defendants argue that, because the regulation governing suspension states that an agency "may" extend the suspension to an affiliate of the wrongdoer, there are "no substantive guidelines, requirements, or criteria by which to measure whether an agency abused or did not abuse its discretion."[43]  Even so, plaintiffs have been able to identify cases that demonstrate that the debarment or suspension of an affiliate, not itself accused of wrongdoing, presents a justiciable controversy. *See Cailoa v. Carroll*, 851 F.2d 395 (D.C. Cir. 1988) (reviewing and reversing suspensions of individuals alleged to be

---

[43] Doc. no. 10 (Brief in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment), at 14.

affiliates of a debarred contractor).  *Cf. Gonzalez v. Freeman*, 334 F.2d 570, 574-75 (D.C. Cir. 1964) ("An allegation of facts which reveal an absence of legal authority or basic fairness in the method of imposing debarment presents a justiciable controversy in our view.").  Thus, the court concludes that plaintiffs do present justiciable claims, and turns to the merits of those claims.

## C.    Rationale for Initial Suspension

Resolution of plaintiffs' APA claims turns on the interpretation accorded to certain provisions of the Federal Acquisition Regulations System.  In the first count of their complaint, plaintiffs allege that their suspension was not based on an adequate rationale and was, therefore, in violation of the APA.[44]  The regulations provide that, "[t]he suspending official may, in the public interest, suspend a contractor for any of the causes in 9.407-2, using the procedures in 9.407-3."  48 C.F.R. § 9.407-1(a)-(b)(1).  Section 9.407-2 enumerates nine offenses that serve as causes for suspension, such as fraud, bribery, antitrust violations, and commission of "other offense[s] indicating a lack of business integrity or business honesty."  *Id.* § 9.407-2(9). Suspension of an individual contractor can lead to the suspension of others:

> Suspension constitutes suspension of all divisions or other organizational
> elements of the contractor, unless the suspension decision is limited by
> its terms to specific divisions, organizational elements, or commodities.
> *The suspending official may extend the suspension decision to include*

---

[44] *See* doc. no. 1 ¶¶ 51-61.

> *any affiliates of the contractor if they are* (1) specifically named and (2)
> given written notice of the suspension and an opportunity to respond (see
> 9.407-3(c)).

*Id.* § 9.407-1(c) (emphasis supplied).   That is, "affiliates" are not automatically

considered suspended, but may be suspended based on the notice and response

procedures found in § 9.407-3(c).  The regulations include a definition of "affiliates."

> Business concerns, organizations, or individuals are affiliates of each
> other if, directly or indirectly, (1) either one controls or has the power to
> control the other, or (2) a third party controls or has the power to control
> both.  Indicia of control include, but are not limited to, interlocking
> management or ownership, . . . shared facilities and equipment, [and]
> common use of employees . . . .

*Id.* § 9.403.

There is no dispute that, through indirect ownership of several subsidiaries,

plaintiffs are "affiliates" of PWC, as defined in the regulations.  The regulatory

language clearly allows for the suspension of affiliates without any allegations of

wrongdoing against them.  The suspending official has the power to "extend" the

suspension to them, and is required only to specifically name the affiliate and provide

it with notice and an opportunity to respond.  To require a finding, or even an

allegation, of wrongdoing, would render the language of § 9.407-1(c) surplusage.

That is, there would be no need for a provision specifically addressing the suspension

of an affiliate if the government was required to apply the same procedures to

affiliates as to principals. Judge Roberts reached the same conclusion when plaintiffs

16

attempted to enjoin their suspension at the outset, stating that "if the determination necessary to suspend the contractor in the first instance and an affiliate of that contractor were the same, it might render Section 9.407(c) a nullity."[45]  Judge Roberts continued:

> [T]here must be some difference in the findings necessary to suspend a contractor in the first instance and to suspend an affiliate of that contractor.  That difference appears to be that Section 9.407-1(c) authorizes a suspending official to suspend an affiliate on the basis of finding the affiliation alone without a finding of culpability.[46]

This court finds Judge Roberts's rationale persuasive, and concludes that the initial suspension of plaintiffs, as affiliates of PWC, was valid.

## D.  Excessive Duration of Suspension

The third count of plaintiffs' alleges that their suspension violates the APA because it has continued for a period greater than eighteen months.[47]  Although the plain language of the regulations supports the validity of the initial decision by the Agency to suspend plaintiffs' contracting privileges, the question of the indeterminate duration of that suspension is murkier.  The regulatory language regarding the duration of suspension does not draw a clear distinction between the suspensions of

---

[45] Bench Ruling Transcript, at Bates 1380.

[46] *Id.* at Bates 1380-81.

[47] *See* doc. no. 1 ¶¶ 66-74.  As noted in the beginning of Part III of this opinion, the second count of plaintiffs' complaint alleges that their continued suspension is "punitive."  *Id.* ¶¶ 62-65. Consideration of that claim is rendered moot by the following discussion and resolution of the claim asserted in the third count.

principals and affiliates, nor does it clearly treat them alike.  The relevant part of the

regulation reads as follows:

> If legal proceedings are not initiated within 12 months after the date of
> the suspension notice, the suspension shall be terminated unless an
> Assistant Attorney General requests its extension, in which case it may
> be extended for an additional 6 months.  In no event may a suspension
> extend beyond 18 months, *unless legal proceedings have been initiated
> within that period*.

48 C.F.R. § 9.407-4(b) (emphasis supplied).   The last sentence of that provision

provides the nub of disagreement between the parties.  Defendants argue that legal

proceedings against the suspended principal contractor allow the continued suspension

of its affiliates.  In other words, they read the sentence as providing that: "In no event

may a suspension *of an affiliate* extend beyond 18 months, unless legal proceedings

have been initiated *against the principal* within that period."   Conversely, plaintiffs

argue that legal proceedings must be initiated against the affiliate itself for the

suspension to continue.  That is, they read the sentence to as saying that: "In no event

may a suspension *of an affiliate* extend beyond 18 months, unless legal proceedings

have been initiated *against the affiliate itself* within that period."

The pivotal issue of whether the suspension of an affiliate may extend beyond

18 months merely on the basis of legal proceedings being brought against the

principal appears to be unsettled.  The parties have not identified a single judicial

decision addressing the issue, nor has the court's independent research discovered

any.[48]  Defendants argue that the regulation allows for the indefinite suspension of an affiliate, because to hold otherwise "would lead to absurd and illogical results," which regulations should be interpreted to avoid.  *See, e.g.*, *Rhode Island Hospital v. Leavitt*, 548 F.3d 29, 37 (1st Cir. 2008).  Plaintiffs argue that to allow indefinite suspension on the basis of affiliation alone would contradict the "structure" of the regulation.

### 1.    Arguments of the parties

Defendants note that subsidiaries may be initially suspended on the sole basis of their affiliation with a parent company accused of impropriety.  They argue that, "if suspension is based on affiliation, it is only logical that the period of suspension for the affiliate should be the same as for the primary contractor."[49]  They state that "[o]ne purpose for suspending affiliates is to prevent the primary contractor from shifting business to its affiliates, thereby allowing the affiliates to bid on government contracts and avoid the consequences of suspension from government contracting."[50]  Defendants further argue that, if affiliation-based suspensions were limited to eighteen months, a suspended contractor could create new subsidiaries to sidestep suspension.  After eighteen months, those new subsidiaries, which did not exist at the time of the

---

[48] In fact, electronic searches of the West and Lexis databases returned only six cases in which § 9.407-4 is mentioned at all, none of which address the question before the court.

[49] Doc. no. 15 (Reply Brief in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment), at 7.

[50] *Id.* at 4.

events leading to indictment of their parent, would be eligible for contracting. The suspended parent would profit from the subsidiaries' contracts. That result, say defendants, would be absurd. They argue that it is only logical that a suspension on the basis of affiliation should last as long as the suspension of the primary contractor, and state that this is what occurs in practice.

Rather than hypothecating circumstances under which primary how contractors might abuse the system, plaintiffs focus their arguments on the text of the regulation itself. Plaintiffs point out the distinctions between the language of § 9.407-1 and that of § 9.407-4. The former section establishes two bases for suspension: suspicion of any of the offenses listed in § 9.407-2, or affiliation with a contractor suspected of any of the offenses listed in § 9.407-2. 48 C.F.R. § 9.407-1(a), (c).[51] Conversely, § 9.407-4 simply states that a suspension may not last longer than eighteen months, "unless

---

[51] The full text of those subsections reads as follows:

(a) The suspending official may, in the public interest, suspend a contractor for any of the causes in 9.407–2, using the procedures in 9.407–3.

. . .

(c) Suspension constitutes suspension of all divisions or other organizational elements of the contractor, unless the suspension decision is limited by its terms to specific divisions, organizational elements, or commodities. The suspending official may extend the suspension decision to include any affiliates of the contractor if they are (1) specifically named and (2) given written notice of the suspension and an opportunity to respond (see 9.407–3(c)).

48 C.F.R. § 9.407-1(a), (c).

legal proceedings have been initiated within that period." *Id.* § 9.407-4(b).[52]  That section makes no distinction between suspensions on the basis on an enumerated cause and those on the basis of affiliation.  Thus, argue plaintiffs, all suspended contractors must be treated equally under that provision, and cannot be suspended for longer than eighteen months unless legal proceedings have been brought against them.

### 2.    Analysis

Plaintiffs' interpretation, based on the text of the regulation itself, is sounder.  Although the regulation establishes two different methods of commencing suspension, it contains only one provision regarding the expiration of suspension.  That one provision must be applied to suspected wrongdoers and suspended affiliates in a consistent manner.  Defendants' concern that plaintiffs' interpretation produces absurd results is mitigated by several factors.  Although defendants state that one reason the regulation allows for the suspension of affiliates is to prevent the primary contractor from shifting business to them, that is but *one* reason.

Another equally plausible reason is to allow the government adequate time to

---

[52] The full text of § 9.407-4(b) provides:

> If legal proceedings are not initiated within 12 months after the date of the suspension notice, the suspension shall be terminated unless an Assistant Attorney General requests its extension, in which case it may be extended for an additional 6 months. In no event may a suspension extend beyond 18 months, unless legal proceedings have been initiated within that period.

48 C.F.R. § 9.407-4(b).

investigate the affiliates for wrongdoing on their own part. That purpose becomes clear when § 9.407-1 and § 9.407-4 are read in conjunction; the government may immediately suspend numerous affiliates on the basis of its suspicion of one of them, and then has a limited period of time in which to determine which affiliates *actually* participated in wrongdoing before it must terminate the suspensions of those not facing accusations. That arrangement allows the government to put an immediate stop to potential wrongdoing that it may not have been able to investigate fully, but it does not give the government the power to suspend an affiliate *indefinitely* without even *suspicion* of wrongdoing. When the investigative purpose of the affiliation-based suspension is considered, the fundamental flaw in defendants' interpretation is revealed. That interpretation would allow the government to issue a blanket suspension against numerous contractors and, so long as proceedings were initiated against one of them, allow the government to sit on its hands, rather than taking steps to investigate and determine within a reasonable period of time whether the affiliates were guilty of misconduct, all while those affiliates suffered the loss of business.[53]

Another flaw in defendants' argument is exposed upon a close reading of the regulatory definition of "affiliate." Defendants' argument is premised on the idea that

---

[53] Because the court finds that plaintiffs' interpretation of the statutory language is correct, it need not address the question of whether defendants' interpretation violates the Due Process Clause. However, to allow the government to suspend a contractor indefinitely, without suspicion, raises due process concerns.

"affiliates" will necessarily be subsidiaries of the "primary" contractor, which will be their parent company. That is, in fact, the scenario here. However, "affiliate" is defined more broadly. Although "control" is integral to the definition, both the parent and the subsidiary are considered affiliates of each other. 48 C.F.R. § 9.403 ("Business concerns, organizations, or individuals *are affiliates of each other* if, directly or indirectly, (1) either one controls or has the power to control the other, or (2) a third party controls or has the power to control both.") (emphasis supplied). Thus, the regulation allows for the suspension of a parent company for the malefactions of its subsidiary, on the mere basis that the parent company is an affiliate of the subsidiary. In such a scenario, the danger of a "primary" contractor shifting business to its "affiliates" and, thereby, circumventing the consequences of suspension would seem to be much reduced.

In addition to the possibility that a contractor will shift business to its subsidiaries if they are not suspended, defendants hypothesize that a suspended contractor could create new, wholly-owned subsidiaries in the wake of a suspension. Because those companies did not previously exist, they could not be tainted with the wrongdoing that led to the suspension of the primary contractor. Defendants argue that an eighteen month cap on affiliation-based suspensions would allow a suspended contractor to use such wholly-owned subsidiaries to engage in unfettered contracting.

That argument is seriously undermined by the regulatory scheme.  In addition to the nine offenses enumerated as cause for suspension in § 9.407-2, there is a catchall provision:  "The suspending official may upon adequate evidence also suspend a contractor for any other cause of so serious or compelling a nature that it affects the present responsibility of a Government contractor or subcontractor."  48 C.F.R. § 9.407-2(c).  The creation of wholly-owned subsidiaries in order to circumvent a suspension arguably fits within that catchall provision.  Thus, plaintiffs' interpretation of the regulation would not, as defendants assert, amount to *carte blanche* for suspended contractors seeking to continue to profit from government contracting, as the government would have cause to suspend new subsidiaries created for the purpose of abusing the system.

Finally, the language of the catchall provision highlights another regulatory requirement that also protects the government from unscrupulous contractors.  Before considering any bid for a contract, the government must determine whether the bidder is presently "responsible."  *See* 48 C.F.R. § 9.103.  "No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility.  In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility."  *Id.* § 9.103(b).  To be found responsible, a contractor must have,

among other things "a satisfactory record of integrity and business ethics . . . ." *Id.* §

9.104-1(d).  The determination of responsibility must be made anew for each potential

contract.  *See OSG Product Tankers, L.L.C. v. United States*, 82 Fed. Cl. 570, 575

(Fed. Cl. 2008); *Frequency Electronics, Inc. v. Department of the Air Force*, 151 F.3d

1029 (Table), No. 97-1551, 1998 WL 377929, at *2 (4th Cir. July 1, 1998)

("'Responsibility' is a present condition and not an indelible status.").  The fact that

a contractor is not suspended or debarred from contacting is no guarantee that it will

be found presently responsible upon submitting a bid.  A contractor that is a newly-

created, wholly-owned subsidiary of a suspended contractor would surely raise a red

flag in the process of determining present responsibility.

The court concludes that the interpretation of the regulation proposed by

plaintiffs is the correct one.  That is, no contractor may be suspended for greater than

eighteen months unless legal proceedings are initiated against that contractor itself,

regardless of the basis for the initial decision to suspend the company.  The facts in

the record are undisputed:   plaintiffs were suspended on the sole basis of their

affiliation with PWC; no legal proceedings have been initiated against them; and they

have remained suspended for thirty-one months — *i.e.*, nearly twice the regulatory

limit of eighteen months.  Their continued suspension is contrary to law, in violation

of the APA.  Therefore, their suspensions must be terminated.  Summary judgment is

due to be granted in favor of plaintiffs, and against defendants.

## IV.  ORDERS AND INJUNCTION

For the reasons stated herein, plaintiffs' motion for summary judgment is GRANTED, and defendants' motion for summary judgment is DENIED.

It is DECLARED that defendants' suspension of plaintiffs for greater than eighteen months, without the initiation of legal proceedings against plaintiffs, is contrary to law.  Additionally, it is DECLARED that plaintiffs are eligible for government contracts, provided they are determined to meet the responsibility requirements of 48 C.F.R. § 9.103.

It is further ORDERED, ADJUDGED, and DECREED that defendants lift plaintiffs' suspension from government contracting, and remove them from the Excluded Parties List.

Costs are taxed to defendants.  The clerk is directed to close this file.

DONE and ORDERED this 26th day of June, 2012.

_____
United States District Judge